# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DEBRA LEONA WIERSMA**
          **Plaintiff,**

    **v.**                                  **Case No. 10-C-240**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
          **Defendant.**

## DECISION AND ORDER

In June of 2006, plaintiff Debra Wiersma applied for social security disability benefits based on back problems and depression. Plaintiff alleged onset of disability on January 20, 2005, the date on which she was admitted to the hospital with severe back pain and urinary incontinence. She subsequently underwent surgery but experienced an uneven recovery, making return to her previous factory work impossible. After completing a vocational rehabilitation program, however, she was able to return to work as an accountant on September 10, 2007.

Arguing that her return to work was based on financial need (and her new employer's accommodation) rather than medical improvement, plaintiff amended her application to seek a closed period of benefits with payments continuing after her return to work consistent with the "trial work period" regulation. See 20 C.F.R. § 404.1592. However, after holding a hearing on the application, an Administrative Law Judge ("ALJ") concluded that plaintiff failed to establish disability at any time from January 20, 2005, through the date of the decision and thus denied the application. The Appeals Council then denied plaintiff's request for review, making

the ALJ's decision the final decision of the agency on plaintiff's application. <u>See</u> 20 C.F.R. § 404.981; <u>Schaaf v. Astrue</u>, 602 F.3d 869, 874 (7th Cir. 2010).

Plaintiff now seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). Because the ALJ erred in evaluating plaintiff's claim, I reverse and remand for further proceedings.

## I. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

Under § 405(g), the reviewing court will reverse if the ALJ's decision lacks the support of "substantial evidence" in the record, is so poorly articulated as to prevent meaningful review, or is based on legal error. <u>See, e.g.</u>, <u>Hopgood ex rel. L.G. v. Astrue</u>, 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Castile v. Astrue</u>, 617 F.3d 923, 926 (7th Cir. 2010); <u>Terry v. Astrue</u>, 580 F.3d 471, 475 (7th Cir. 2009). Thus, if reasonable people could differ as to whether the claimant is disabled, the court must defer to the ALJ's decision to deny the claim. <u>Elder v. Astrue</u>, 529 F.3d 408, 413 (7th Cir. 2008).

But deferential review is not abject. <u>Parker v. Astrue</u>, 597 F.3d 920, 921 (7th Cir. 2010). The court must review the entire record, including both the evidence that supports the ALJ's conclusions as well any evidence that fairly detracts from their weight. <u>See</u> <u>Young v. Sec'y of Health and Human Services</u>, 957 F.2d 386, 388-89 (7th Cir. 1992). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." <u>Denton v. Astrue</u>, 596 F.3d 419, 425 (7th Cir. 2010). Thus, if on its review the court finds that the ALJ

ignored important evidence, or failed to build an accurate and logical bridge from the evidence to the result, the case will be remanded. <u>Villano v. Astrue</u>, 556 F.3d 558, 562 (7th Cir. 2009). Further, judicial review is limited to the reasons provided by the ALJ in her decision; such reasons may not be supplied later by the Commissioner's lawyers. <u>See, e.g.</u>, <u>Larson v. Astrue</u>, 615 F.3d 744, 749 (7th Cir. 2010). Finally, if the ALJ commits an error of law, such as violating agency rules for evaluating disability claims, <u>see</u> <u>Moss v. Astrue</u>, 555 F.3d 556, 561 (7th Cir. 2009); <u>Prince v. Sullivan</u>, 933 F.2d 598, 602 (7th Cir. 1991), the court will reverse without regard to the volume of evidence in support of the factual findings, <u>White v. Apfel</u>, 167 F.3d 369, 373 (7th Cir.1999); <u>Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir. 1997).

## B.    Disability Standard

Disability is determined under a sequential, five-step, test. <u>See</u> 20 C.F.R. § 416.920(a)(4). Under this test, the ALJ asks (1) whether the claimant is unemployed; (2) if so, whether the claimant has a severe impairment; (3) if so, whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner as presumptively disabling;[1] (4) if not, whether the claimant can, given her residual functional capacity ("RFC"), perform her past relevant work; and (5) if not, whether the claimant is capable of performing other work in the national economy. <u>See, e. g.</u>, <u>Simila v. Astrue</u>, 573 F.3d 503, 512-13 (7th Cir. 2009).

The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the agency to show that the claimant can make the

---

[1]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). In order to meet a Listing, the claimant must present evidence showing that she satisfies each of its "criteria." <u>See</u> <u>Maggard v. Apfel</u>, 167 F.3d 376, 379-80 (7th Cir. 1999).

adjustment to other work. <u>See, e.g.</u>, <u>Briscoe v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005). The agency may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of her limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education, and work experience. However, the ALJ may not rely on the Grid and must consult a VE if the claimant's vocational factors and RFC do not coincide with all of the criteria of a particular Grid rule or if the claimant otherwise suffers from significant non-exertional impairments. <u>See</u> <u>Haynes v. Barnhart</u>, 416 F.3d 621, 627 (7th Cir. 2005); <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 n.3 (7th Cir. 1990); <u>Neave v. Astrue</u>, 507 F. Supp. 2d 948, 953 (E.D. Wis. 2007).

## II. FACTS AND BACKGROUND

### A. Treatment Records

Plaintiff experienced back pain dating back to about 2002 (Tr. at 322), with a November 2004 MRI revealing lumbar stenosis (Tr. at 265), but on January 20, 2005, she presented at St. Joseph's Hospital complaining of acute pain with urinary incontinence (Tr. at 288). An MRI revealed severe, multi-level degenerative disc disease (Tr. at 291-92), and plaintiff was immediately transferred to Froedert Hospital for evaluation by a spine surgeon (Tr. at 288-89). Given the severity of her condition, on January 25, 2005, Dr. Jamie Baisden performed L3-4-5 laminectomies with bilateral L3-4 and L4-5 foraminotomies and L3 through S1 transpedicular fixation and fusion with bone stimulator placement. Plaintiff discharged home on January 29 and returned to see Dr. Baisden for follow up on February 2. Her paresthesias on the anterior thigh was somewhat improved, but she complained of periodic leg cramps. Dr. Baisden

prescribed a trial of Klonopin for the cramps and continued plaintiff on Oxycontin and other medications. (Tr. at 253; 258-64.)

Plaintiff returned to Dr. Baisden on February 28, indicating that the leg cramps were less frequent but complaining of clumsiness of the right foot when walking. Dr. Baisden encouraged her to increase her activities as tolerated to build up her endurance and recommended exercises to address right dorsiflexion weakness. He did not anticipate return to work until about four months post-surgery. (Tr. at 252.)

Plaintiff next saw Dr. Baisden on April 11, reporting that she was self-weaning from narcotics and slowly increasing her activities. The leg cramps seemed to be improving, and she noted no urinary incontinence, but she still had clumsiness in the right foot. Dr. Baisden instructed her on the weaning of her orthosis and planned to discuss an aggressive out-patient rehab program and timing of her return to work if she was doing well on her next visit. (Tr. at 251.)

Plaintiff returned to Dr. Baisden on May 23, complaining of daily headaches. Her husband also expressed concern that she may have increased her activities too much too soon, in particular with respect to housework. On exam, plaintiff was able to ambulate independently with a somewhat wide-based but steady gait. Dr. Baisden recommended aquatic therapy and out-patient physical therapy for lumbar and core strengthening. (Tr. at 250.)

When plaintiff next saw Dr. Baisden on July 13, she appeared very frustrated, continuing to have pain in the right buttocks extending down along the proximal posterior thigh, as well as numbness in the right foot. On exam, she appeared to have right dorsiflexion weakness. She also complained of urinary urgency without incontinence. Dr. Baisden recommended a CT

5

scan to check placement of the surgical instrumentation and, if her foot pain continued, an EMG/nerve conduction study. He also asked her to see a urologist (Tr. at 248) and advised her to refrain from work until further notice (Tr. at 249).

Plaintiff returned to Dr. Baisden on August 1, reporting a 50% decrease in pain since her last visit. She also noted improvement in the strength of her toes and to a lesser degree of the right dorsiflexion. The CT scan revealed no evidence of any instrumentation mal-positioning or loosening, and the spinal canal appeared to be well decompressed. Dr. Baisden noted continued slow improvement and suggested a return to work as of August 15, 2005, starting with four hours per day, with the ability to change positions, a twenty pound lifting maximum, and limited bending and twisting. If plaintiff tolerated this, Dr. Baisden indicated that he would increase the hours as her endurance improved. (Tr. at 245, 247, 286-87.)

However, when plaintiff next saw Dr. Baisden on September 12 she noted persistent weakness in the right foot, with trouble walking on stairs or carpet. Further, despite repeated calls to her then-employer, no light duty position had been found, and plaintiff expressed an interest in seeking work elsewhere. Dr. Baisden advised plaintiff to work with her primary care physician or a pain clinic on chronic pain management; she was to returned to his office on an as needed basis. (Tr. at 245-46.)

On September 29, plaintiff saw Dr. Paul Chambers, complaining of pain everywhere when her medication wore off. She still had some back pain, but at that time the pain was everywhere in her body. She was not sleeping very well, and was tearful and crying. Dr. Chambers assessed multiple pain syndrome with low back pain. He continued her medications and referred her to physiatry and rheumatology. (Tr. at 282.)

On October 20, plaintiff saw Dr. Linda Walby, a physiatrist, on referral from Dr.

6

Chambers. Plaintiff reported poor leg control and weakness in her right leg post-operatively, but her bladder had improved to normal. She continued to experience pain, for which she used Oxycodone. She reported current symptoms of periodic "zapping" pain in her right buttock, inability to elevate her foot to put her right shoe on, and inability to do the laundry. She also reported feeling depressed related to her physical condition. (Tr. at 322.) On exam, she was able to very slowly perform toe, heel, and tandem pattern of gait; her lumbar spine range of motion was restrictive in all planes, at least 50% and mostly 75% restricted. (Tr. at 323.) Dr. Walby assessed problems of neuropathic pain based on chronic right L5 radiculopathy, status post L3 through S1 multi-level decompression and fusion, and myofascial pain syndrome. Dr. Walby hoped to wean plaintiff from narcotic pain medication and suggested a trial of Cymbalta. She also prescribed Klonopin to help with restless leg irritation interfering with sleep. (Tr. at 321.)

Plaintiff returned to Dr. Walby on November 17, feeling better. She reported that the Cymbalta stopped her "zapping" pain and the Klonopin helped with sleep. She was scheduled to see Dr. Thompson in the behavioral health department. Dr. Walby continued her medications, with the plan to reduce Oxycontin usage by one half in one month. (Tr. at 319.))

On November 22, plaintiff saw Dr. Thompson, who assessed an adjustment disorder and PTSD, with a GAF of 50.[2] (Tr. at 333.) She subsequently underwent counseling with Dr. Thompson, noting improvement at times and discussing family and parenting issues. (Tr. at

_____

[2]"GAF" stands for "Global Assessment of Functioning." Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

335-36; 373.)

On December 15, plaintiff and Dr. Walby reviewed stress management strategies, and Dr. Walby continued medications. (Tr. at 317.) On January 24, 2006, plaintiff advised Dr. Walby that she recently aggravated her back turning over in bed, with new bladder control problems. Dr. Walby refilled medications and suggested follow-up with Dr. Baisden, but it appears that did not occur. (Tr. at 314-15.) Plaintiff also had a urology consult with Dr. Bishop, who re-started her on Ditropan (Tr. at 308-10), and a rheumatology consult with Dr. Jeanna Owens, who diagnosed fibromyalgia (Tr. at 303-06), and underwent a cervical scan, which revealed mild to moderate degenerative disease in the mid cervical spine (Tr. at 307). Plaintiff returned to Dr. Walby on February 22, feeling better and continued on her current medications. (Tr. at 301.) She returned to the urologist the next day, doing much better on Ditropan. (Tr. at 299-300.)

On March 9, plaintiff underwent a lumbar CT, which revealed widespread surgical and laminectomy fusion changes, L3 through S2, with degenerated discs. The report also noted some disc bulging at the L2-3 level, similar to prior CT appearance. (Tr. at 284-85.) On March 24, plaintiff saw Dr. Walby, who noted that the recent CT scan showed no acute problems. Plaintiff reported doing better with her right foot now "working." Her bladder remained improved on the medications from Dr. Bishop. Dr. Walby again planned to wean plaintiff from Oxycontin, more slowly. (Tr. at 297-98.)

On March 28, 2006, and July 16, 2006, Dr. Walby completed reports limiting plaintiff to less than full-time work. (Tr. at 387-92.) Specifically, Dr. Walby indicated that plaintiff could work two hours per day (and sit just two hours in an eight hour day). (Tr. at 389; 391.)

On July 6, plaintiff returned to Dr. Chambers, her first visit to him since the previous

8

autumn. She reported that Dr. Walby got her off narcotics but complained of leg swelling. Dr. Chambers prescribed Lasix and ordered various tests. (Tr. at 415-16.) On July 12, plaintiff complained of urinary frequency and large volumes, which Dr. Chambers suspected was due to the Lasix. (Tr. at 413-14.) Plaintiff again saw Dr. Chambers on October 4, complaining of bronchitis. He advised her to stop smoking. (Tr. at 411.)

On November 1, plaintiff saw Dr. Kenneth Yuska regarding her back problems. (Tr. at 375.) On examination, plaintiff was able to stand and walk, but unable to do heel or toe walking with her right leg. Lumbar flexion movements were quite good, and she was able to bend to her toes. Her thoracic and cervical spines were non-tender, and she had full range of movement of the cervical spine. Neurologic examination showed foot drop on the right side, and her sensation was diminished over a wide area of the right lower extremity. Upper extremity examination was within normal limits. Lower extremity movements were normal at the hips and knees. Dr. Yuska reviewed imaging studies, noting that the March 2006 CT showed substantial degenerative changes of the lumbar spine. (Tr. at 377.) Dr. Yuska diagnosed post-laminectomy syndrome, noting plaintiff to have a fair result from her surgery. She experienced good relief of back pain and was able to bend and touch her toes. However, she experienced residual right foot drop with numbness and cramping in her foot, which Dr. Yuska found unlikely to improve. Dr. Yuska opined that she was not a candidate for another surgery (Tr. at 378), instead recommending that she "make the most out of a conservative back pain program" (Tr. at 379). He suggested exercise including swimming, cycling, or short periods on a rowing machine. As plaintiff was not interested in further pain medications, Dr. Yuska discounted visiting a pain clinic. He recommended that she seek help in a rehabilitation clinic to provide supervision of her exercises, help her with weight reduction, and provide

guidance on issues of depression. Given her periodic crying during the exam, Dr. Yuska also suggested anti-depressant medication as an adjunct to her counseling program. (Tr. at 379.) Dr. Yuska concluded that other than some weakness and numbness of the right foot, plaintiff was doing reasonably well from a mechanical standpoint. Her main problems were weight gain and numbness and weakness in her right foot. Dr. Yuska encouraged plaintiff to seek care for her depression and referred her to a psychotherapist. (Tr. at 374.)

On December 13, plaintiff returned to Dr. Chambers for follow up, indicating that Dr. Walby weaned her from narcotics and started her on Cymbalta, which worked fairly well. When things got better, she stopped Cymbalta. However, during the fall of 2006, she noted having more problems. She also reported significant weight gain, up fifty pounds since September 2005 and more than that since her surgery. She further reported feeling very discouraged because it was hard to do anything. She continued to have pain in the right leg with spasms at night. (Tr. at 409.) Dr. Chambers assessed chronic back pain and chronic neuropathy and placed her back on Cymbalta. (Tr. at 410.)

On February 9, 2007, plaintiff advised Dr. Chambers that her mood swings and pain had improved significantly on Cymbalta. (Tr. at 406-07.) On June 8, however, she told Dr. Chambers that she was feeling very tired, crying a lot, and forgetful. She complained that she could not do her usual chores around the house, had to rely on her family, and slept poorly. Dr. Chambers referred her for a sleep apnea assessment and increased her Cymbalta dosage. (Tr. at 402-03.) She returned to Dr. Chambers on June 22, for follow-up regarding malaise, fatigue, depressive symptoms, and aching pains. (Tr. at 398.) On July 5, plaintiff saw Dr. Chambers again complaining of fatigue. She stated that she was not unhappy, was able to concentrate, but felt tired all the time and had to push herself to do even things she enjoyed

doing. Dr. Chambers again recommended that she proceed with a sleep apnea evaluation. (Tr. at 395.)

## B.    Vocational Records

In the summer of 2006, the Wisconsin Division of Vocational Rehabilitation ("DVR") found plaintiff eligible for services based on her back injury, which limited her to light duty work and precluded her from returning to her previous factory work. (Tr. at 165-66, 204-05.) She subsequently took accounting classes at Moraine Park Technical College from the fall of 2006 through the fall of 2007. (Tr. at 167-84.) After she obtained a job in the accounting department at Ewald Chevrolet on September 10, 2007, the DVR closed her file. (Tr. at 185.)

## C.    SSA Consultants' Reports

The Social Security Administration ("SSA") arranged for plaintiff's claim to be evaluated by several medical professionals. On August 28, 2006, plaintiff saw Peggy Dennison, Ph.D., for a psychological evaluation. Dr. Dennison opined that it seemed unlikely that plaintiff's reported pain could be attributed entirely to her verified physical injury, but she also found it unlikely plaintiff was malingering. Dr. Dennison diagnosed pain disorder associated with both psychological factors and general medical condition, with a GAF of 57. (Tr. at 344.)

On September 8, 2006, Eric Edelman, Ph.D., completed a psychiatric review technique form, assessing plaintiff under the Listings for affective disorders, anxiety-related disorders, and somatoform disorders. (Tr. at 346.) Under the "B criteria" of those Listings, he found mild limitation of activities of daily living and social functioning, moderate limitation of concentration, persistence, and pace, with no episodes of decompensation. (Tr. at 356.) In an accompanying mental RFC report, he found no significant limitation in most areas, moderate limitations in a

few.  (Tr. at 360-61.)

On September 11, 2006, Dr. Mina Khorshidi completed a physical RFC assessment form for the SSA, finding plaintiff capable of sedentary work with no additional limitations.  (Tr. at 364-71.)

On January 28, 2007, plaintiff saw Dr. A. Neil Johnson for a consultative evaluation of her physical impairments.  Plaintiff advised that she could lift only five pounds, walk half a block, stand ten minutes, and sit for thirty minutes.  She identified no problems with use of her hands.  She described using Cymbalta and Lisinopril for pain management.  (Tr. at 381.)  On exam, she had moderate difficulty getting on and off the table, severe difficulty with heel and toe walking, could squat a third of the way holding onto the table, and could not hop.  (Tr. at 382.)  Physical examination showed good motion of the back except for extension.  She had numbness and some weakness in the right leg.  Her weight was a major aggravating factor. (Tr. at 383.)

On February 2, 2007, Dr. Robert Callear reviewed the file and affirmed the physical RFC assessment completed in September 2006.  (Tr. at 385.)  On February 5, 2007, Roger Rattan, Ph.D., reviewed the file and affirmed the mental reports completed in September 2006.  (Tr. at 386.)

**D.     Hearing Testimony**

At the hearing before the ALJ, plaintiff testified that after working with the DVR and attending school in 2006, she returned to work, full-time, as an accountant in September 2007, earning $10 per hour.  (Tr. at 25-29.)  However, she testified that even after her 2005 surgery she continued to experience pain, mobility problems, and trouble driving more than short distances.  (Tr. at 29.)  She stated that her current employer was aware of her back problems,

provided a special chair, and permitted her to shift positions as needed. (Tr. at 31.)

Plaintiff testified that she drove about thirty-five miles to work, and that she sometimes had problems with her foot when coming home, requiring her to pull over. (Tr. at 32-33.) She testified that during the beginning of the work day she rated her back pain 3 to 4 on a 1 to 10 scale, and that it worsened, up to 7, as the day progressed. (Tr. at 33.) She indicated that she usually took Tylenol around lunch time and shifted positions to ease the pain. (Tr. at 34.)

Plaintiff stated that although she no longer received therapy for depression, and her back was her primary problem, her depression issues mixed with her back problems. (Tr. at 35-36.) She also testified to continuing problems with bladder incontinence, stating that she wore a pad at work. She also testified to a fear of tripping and falling due to numbness in her right leg and foot. (Tr. at 36-37.) She stated that she was afraid of what would happen when her children left home, as they helped with chores and housework. (Tr. at 38-39.)[3]

### E.    ALJ's Decision

Following the five-step procedure, the ALJ first determined that plaintiff did not engage in substantial gainful activity ("SGA") from January 20, 2005, the alleged disability onset date, through September 6, 2007, after which she returned to full-time work. (Tr. at 13.) At step two, the ALJ determined that plaintiff suffered from the severe impairments of lumbar disc disease, status post lumbar laminectomy and fusion, and morbid obesity. (Tr. at 14.) The ALJ found plaintiff's urinary incontinence and depression non-severe. (Tr. at 14.) At step three, the ALJ found that none of plaintiff's impairments met or medically equaled a Listing. (Tr. at 14-17.) The ALJ then concluded at step four that plaintiff retained the RFC to perform the full range of

_____

[3]The ALJ summoned a VE to the hearing but elected not to take testimony from her. (Tr. at 39.)

13

sedentary work (Tr. at 18), which precluded her from returning to her past work performed at the medium to heavy level (Tr. at 20).  Finally, the ALJ concluded that based on plaintiff's age, education, work experience, and RFC for sedentary work, Grid Rule 201.28 directed a finding of not disabled.  (Tr. at 20.)  The ALJ therefore found plaintiff not disabled from January 20, 2005, through the date of decision and accordingly denied the application.  (Tr. at 20-21.)

## III.  DISCUSSION

Plaintiff argues that the ALJ erred in a variety of ways, including by failing to properly analyze her claim under the Listings, by rejecting Dr. Walby's reports, and by finding her testimony less than fully credible.  Plaintiff further contends that the ALJ erred in relying on the Grid at step five and in failing to consider a closed period claim.

### A.    The Listings

On the Listings, the ALJ wrote:

No treating or consulting physician concluded that any of the claimant's alleged physical or mental impairments met or equaled the severity of a listed impairment.  No physician imposed marked or extreme functional limitations on the claimant.  At most the claimant was restricted to sedentary work, which was consistent with the medical evidence of record.

(Tr. at 17.)

As plaintiff notes, the ALJ failed to mention the Listing, § 1.04, applicable to disorders of the spine; nor did she specifically discuss the medical evidence in conjunction with that Listing's criteria.  See, e.g., Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006) (explaining that the ALJ should mention the specific listings she is considering and her failure to do so, if combined with a perfunctory analysis, may require a remand); Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) ("In considering whether a claimant's condition meets or equals a listed

14

impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing."); Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003) (stating that "failure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand"); Scott v. Barnhart, 297 F.3d 589, 595 (7th Cir. 2002) (remanding where the ALJ failed to discuss or even reference the relevant Listing).[4] The Commissioner responds that while the ALJ failed to cite the Listing by number, she nevertheless adequately discussed the medical evidence, see Jolivette v. Astrue, 332 Fed. Appx. 326, 327 (7th Cir. 2009) ("It is not necessary to cite a regulation by number; the agency's obligation is to apply the law to the facts, and this ALJ did so by covering each ingredient of Listing 1.04A."), and reasonably concluded that plaintiff failed to carry her burden of proving disability, see Maggard, 167 F.3d at 380 ("The claimant bears the burden of proving his condition meets or equals a listed impairment."). While an ALJ's failure to consider a Listing with specificity need not invariably require remand, in this case it does.

The record contains evidence, which the ALJ failed to specifically discuss, suggesting that plaintiff meets this Listing. As is relevant here, Listing 1.04 requires:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
>
> With:

---

[4]Nor, plaintiff notes, did the ALJ discuss the obesity section, 1.00(Q), which requires the ALJ to consider the cumulative impact of obesity in determining whether the claimant has a Listing-level impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(Q) (explaining that because the combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately, when determining whether an individual with obesity has a listing-level impairment or combination of impairments adjudicators must consider any additional and cumulative effects of obesity).

> A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subt. P, App. 1, § 1.04. Breaking this out, to meet the Listing plaintiff must show a spinal disorder resulting in compromise of a nerve root, with (1) evidence of nerve root compression characterized by neuroanatomic distribution of pain, (2) limitation of motion of the spine, (3) motor loss (atrophy with associated muscle weakness or muscle weakness), (4) sensory or reflex loss, and (5) (because she alleged involvement of the lower back) positive straight-leg raising test, sitting and supine.

The medical evidence shows that plaintiff suffers from spinal/lumbar stenosis and degenerative disc disease (Tr. at 258, 259) with radiculopathy (Tr. at 262) and nerve root displacement (Tr. at 287), limited lumbar range of motion (Tr. at 323), poor leg control and weakness of the right leg (Tr. at 322), impaired sensation and reflex loss (Tr. at 323), and a "strongly positive right straight leg raise seated and supine" (Tr. at 323). This is not to say that the evidence conclusively supports a finding of disability under the Listing. As the ALJ noted, Dr. Baisden's records reflect a positive post-operative recovery, with plaintiff reporting a 50% decrease in pain by August 2005. Dr. Baisden also noted that, according to scans, the spinal canal appeared to be well decompressed. (Tr. at 14-15, 247.) However, Dr. Baisden's treatment relationship with plaintiff ended in the fall of 2005, at which point Dr. Walby assumed her care. Although Dr. Walby noted some improvement following her initial evaluation in the fall of 2005 (Tr. at 319), by January 2006 Dr. Walby noted renewed, severe pain, with a strongly positive straight leg raise, assessing neuropathic pain based on chronic right L5 radiculopathy (Tr. at 314). Dr. Walby further noted that, at that time (January 2006), plaintiff

16

"present[ed] as she did acutely in January 2005."  (Tr. at 314.)

Rather than reviewing this evidence under the Listing's criteria, the ALJ simply stated that no physician found that plaintiff satisfied a Listing.  But the issue of whether a claimant meets a Listing is reserved to the Commissioner, <u>see</u> 20 C.F.R. § 416.927(e)(2); reports from a treating or consulting physician are relevant, but not dispositive.  The ALJ should have made a Listing determination based on the entire record and not simply relied on reports.

Plaintiff argues that because she meets Listing 1.04 I should remand with instructions to award benefits for the closed period.  However, because the record does not compel that result, and because it is the ALJ's job, not the court's, to review the record and resolve conflicts and ambiguities in the evidence, I will instead remand for reconsideration of plaintiff's Listing claim.  <u>See</u> <u>Neave</u>, 507 F. Supp. 2d at 966-67 ("Ordinarily, when an ALJ errs, the appropriate remedy is to remand for further proceedings.  Only if all essential factual issues have been resolved and the record clearly supports a finding of disability should the court order benefits.").[5]

**B.    Dr. Walby's Reports**

The ALJ characterized Dr. Walby's reports as finding plaintiff capable of "perform[ing] a wide range of sedentary work."  (Tr. at 16.)  However, Dr. Walby limited plaintiff to sitting two hours in an eight hour workday, which is inconsistent with a full range of sedentary work, <u>see</u> SSR 96-9p (stating that in order to perform a full range of sedentary work the claimant must

---

[5]The ALJ should on remand also consider the effects of plaintiff's obesity under the Listings and in determining RFC.  The ALJ found obesity to be a severe impairment, but aside from mentioning plaintiff's weight gain as a negative factor in her credibility analysis, she appeared to give it no consideration at steps three or four.  Further, the consultative examiner, Dr. Johnson, found plaintiff's weight a "major aggravating factor."  (Tr. at 383.)

be able to sit approximately 6 hours of an 8-hour workday, and that inability to do so erodes the unskilled sedentary occupational), and to two hours of work per day, which is obviously incompatible with any full-time employment, see Elder, 529 F.3d at 414 (citing Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000) (explaining that, under SSR 96-8p, ability to work only part-time mandates disability finding); Kelley v. Apfel, 185 F.3d 1211, 1214-15 (11th Cir. 1999) (same)).

Under SSA regulations, opinions from a claimant's treating physician are entitled to special consideration. If such an opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight." SSR 96-8p; Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000). Even if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, she may not simply reject it. SSR 96-2p. Rather, she must determine the weight to give the opinion by considering a variety of factors. See 20 C.F.R. § 404.1527(d). Regardless of the weight the ALJ ultimately affords the treating source opinion, she must always offer "good reasons" for her decision. E.g., Campbell v. Astrue, No. 10-1314, 2010 WL 4923566, at *6 (7th Cir. Dec. 6, 2010).

Here, the ALJ failed to give good reasons. Indeed, she seemed not to notice that Dr. Walby's report ultimately favored plaintiff's contention of disability. Rather, she selectively cited portions of the report that supported her conclusion. See Campbell, 2010 WL 4923566, at *7 ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability."); Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence.") (internal quote marks

18

omitted).

The Commissioner argues that Dr. Walby's pessimistic assessment of plaintiff's abilities was contradicted by other evidence, so the ALJ was not required to accord the report any significant weight. But the ALJ did not rely on the evidence the Commissioner cites to discount Dr. Walby's report, and it is the ALJ, not the Commissioner's lawyers, who must build an accurate and logical bridge from the evidence to the conclusion. <u>Steele v. Barnhart</u>, 290 F.3d 936, 942 (7th Cir. 2002); <u>see also</u> <u>Spiva v. Astrue</u>, No. 10-2083, 2010 WL 4923563, at *1 (7th Cir. Dec. 6, 2010) (criticizing the Commissioner's lawyers for relying heavily on evidence not relied on by the administrative law judge); <u>Golembiewski v. Barnhart</u>, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). The matter must be remanded for reconsideration of Dr. Walby's opinions.[6]

## C.    Credibility

The ALJ found plaintiff's testimony "generally credible, but not to the extent she alleged an inability to perform even sedentary work." (Tr. at 18.) As the ALJ acknowledged (Tr. at 18), credibility is evaluated through a two-step process. <u>See</u> SSR 96-7p. The ALJ must first determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the symptoms cannot be found to affect her ability to work. If so, the ALJ must determine the extent to which they limit her ability to work. SSR 96-7p. In making this determination, the ALJ may not discredit the claimant's statements based solely on a lack of support in the medical evidence. <u>Moss v.</u>

_____

[6]Reconsideration of Dr. Walby's report may also alter the ALJ's evaluation of the Listings.

19

Astrue, 555 F.3d 556, 561 (7th Cir. 2009). Rather, the ALJ must consider all of the evidence, including the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. The ALJ must then provide specific reasons for the credibility determination, grounded in the evidence and articulated in the decision. See Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003). If the ALJ substantially complies with these requirements, the court will afford her credibility determination special deference, reversing only if it is "patently wrong." See, e.g., Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010).

As noted, in the present case the ALJ wrote that while plaintiff's "testimony was generally credible," her claimed "inability to perform even sedentary work . . . was not supported by the medical evidence or the functional capacity assessments in the record." (Tr. at 18.) The ALJ further stated that while plaintiff's medically determinable impairments could be expected to cause the symptoms alleged, plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. at 19-20.)

As the Seventh Circuit has noted, this sort of finding turns "the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating . . . credibility as an initial matter in order to come to a decision on the merits." Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 788 (7th Cir. 2003). The Seventh Circuit has also condemned the practice of finding a claimant generally

20

or partially credible, without identifying which statements are credible and which not credible. See Spiva, 2010 WL 4923563, at *1. Finally, the ALJ appeared to discount plaintiff's testimony based on a lack of objective medical support, which is inconsistent with SSR 96-7p's second step. See, e.g., Villano, 556 F.3d at 562 ("[T]he ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it.") (citing SSR 96-7p).

It is true that the ALJ, in the body of her decision, provided additional reasons for her credibility determination, which generally tracked the factors in 20 C.F.R. § 404.1529(c)(3). Specifically, she noted that plaintiff returned to full-time work in September 2007 with minimal accommodations; plaintiff admitted driving thirty-five miles to work daily, despite her claim that she could drive only short distances prior to September 2007; plaintiff was able to attend school in the spring and fall of 2007; plaintiff testified that she is a good employee and was a good student; plaintiff used only over-the-counter medications for pain, pursuing no rehabilitation or treatment at a pain clinic; and plaintiff received no ongoing mental health treatment. (Tr. at 18-19.) The ALJ further noted that plaintiff's activities, as reported in her and her husband's function reports, suggested an ability to perform at least sedentary work and that, despite plaintiff's allegations to the contrary, the medical records showed substantial improvement in her back condition within twelve months of her surgery. Finally, the ALJ found plaintiff's weight gain and attempts to have children with her new husband inconsistent with her claim of debilitating back pain. (Tr. at 19.)

However, several of these reasons are flawed. First, the ALJ relied on plaintiff's post-September 2007 activities, without discussing the credibility of plaintiff's testimony regarding her condition during the closed period. The ALJ also ignored plaintiff's testimony that, even

after her return to work, she found it hard to drive long distances, sometimes pulling over on the way home.  (Tr. at 32-33.)  Nor can I discern why it is that plaintiff's status as a "good employee" makes her less credible.  Second, the ALJ failed to explain how plaintiff's ability to take classes during the closed period impacted her credibility.  See Gibson-Jones v. Apfel, 995 F. Supp. 825, 826 (N.D. Ill. 1998) (noting that the ability to attend college is not necessarily inconsistent with inability to work full-time); see also 20 C.F.R. § 404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.").  Third, the ALJ placed significant weight on the daily activities discussed in the function reports, despite the Seventh Circuit's admonishment that such activities may say little about the claimant's ability to hold a job outside the home.  E.g., Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).  Finally, the ALJ failed to explain why plaintiff's weight gain made her less credible; only if the ALJ believed that plaintiff gained weight on purpose, despite the likely adverse impact on her back pain, would this appear to diminish her credibility.  And a person's desire to have children may cause her to be willing to endure additional pain.  Cf. Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005).

In light of these errors, and given the fact that this matter must be remanded for reconsideration of the Listings and Dr. Walby's reports anyway, I will also direct the ALJ on remand to re-evaluate credibility.  In particular, the ALJ may conclude that Dr. Walby's reports, properly considered, support plaintiff's claims regarding her inability to perform a full range of sedentary work.  The ALJ should also pay closer attention to issues of timing, for this case raises the issue of a closed period claim.  Specifically, the ALJ must, on review of Dr. Walby's reports and the entire record, determine whether and when plaintiff retained the ability to

perform a full range of sedentary work.

Although plaintiff does not specifically contest the ALJ's findings that her depression and bladder issues are non-severe, the ALJ nevertheless must consider all impairments, severe and non-severe, in setting RFC.  <u>See</u> <u>Terry</u>, 580 F.3d at 477 ("[A]n ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation.").  The ALJ will then have to determine whether VE testimony is needed. Finally, the ALJ will, on remand, have to consider whether plaintiff qualifies for a closed period of benefits from January 20, 2005 to September 7, 2007; whether her return to work was based on medical improvement, <u>see</u> 20 C.F.R. 404.1594; and whether she is entitled to continued benefits under the trial work period regulations.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and the matter is **REMANDED** for further proceedings consistent with this decision.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 8th day of December, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

23